IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          )
                                  )
          vs.                     )     Criminal No. 07-163
                                  )     See Civil Action No. 10-1289
RAY KELLY,                        )
                                  )
          Defendant/petitioner.   )

## MEMORANDUM OPINION

BLOCH, District J.

Petitioner, on October 1, 2010, filed a pro se "Motion to Vacate under 28 U.S.C. § 2255" (Doc. No. 168) and memorandum in support thereof (Id.).  Upon consideration of this motion, and upon further consideration of the Government's response thereto (Doc. No. 173), filed on November 29, 2010, and Petitioner's reply to the Government's response (Doc. No. 178), filed on February 17, 2011, the Court denies Petitioner's motion for the reasons set forth below.

## I.   **Background**

On June 5, 2007, a grand jury sitting in the Western District of Pennsylvania returned a six-count superseding indictment.  Count One charged Petitioner, Marlin Kimbrew, William Shannon, Casee Kelly ("Casee"), and Jacynta Jordan, with knowingly, intentionally, and unlawfully conspiring to distribute and possessing with intent to distribute five

1

kilograms or more of a mixture and substance containing a

detectable amount of cocaine, from in or around March 2003, to

on or about January 25, 2007, in violation of 21 U.S.C. § 846.[1]

(Doc. No. 30).   On November 28, 2007, the Government filed an

information pursuant to 21 U.S.C. § 851.   (Doc. No. 110).

Petitioner pled guilty to Count One on November 29, 2007.   (Doc.

No. 113).   He subsequently filed a motion to dismiss the

indictment on double jeopardy grounds on February 26, 2008, and

a motion to withdraw his guilty plea on March 12, 2008.   (Doc.

Nos. 124, 126).   On March 27, 2008, Petitioner filed his

position with respect to sentencing factors and an objection to

the Section 851 information filed by the Government.   (Doc. Nos.

128, 130).

     The Court issued its tentative findings on April 10, 2008,

and on April 17, 2008, a hearing was held on Petitioner's

motions.   (Doc. Nos. 135, 140).   The Court denied both motions

and sentenced Petitioner to a term of 240 months' imprisonment

followed by ten years' supervised release.   (Id. at 140).   The

Court ordered the sentence to be served concurrently with

Petitioner's sentence imposed at Case No. IP 04-00106-CR-2 in

the Southern District of Indiana.   (Id.)

---

[1]     Counts Two through Six charged Kimbrew with various money
laundering offenses.

Petitioner appealed from the Court's final judgment on April 25, 2008, challenging his conviction and sentence. (Doc. No. 144). The United States Court of Appeals for the Third Circuit ("Third Circuit") affirmed Petitioner's conviction and sentence on October 21, 2009.[2] (Doc. No. 156). Petitioner subsequently filed a motion to reduce/adjust sentence pursuant to 18 U.S.C. §§ 3584 & 3585 on December 7, 2009, arguing that the Court failed to adjust his sentence pursuant to United States Sentencing Guidelines ("USSG") § 5G1.3(b). (Doc. No. 158). The Court found that the adjustment was unwarranted and denied the motion on December 30, 2009.[3] (Doc. No. 159). On October 1, 2010, Petitioner, acting pro se, filed the present motion to vacate his sentence pursuant to 28 U.S.C. § 2255 (Doc. No. 168).[4]

---

[2]   The Third Circuit also granted counsel's motion to withdraw. (Doc. No. 156).

[3]   The Court found that USSG § 5G1.3(a) applied but nevertheless chose to exercise its discretion to vary from the guidelines and impose a concurrent sentence pursuant to 18 U.S.C. § 3584. The Court's decision to vary, however, did not change its ruling that USSG § 5G1.3(b) was inapplicable.

[4]   On October 4, 2010, in accordance with United States v. Miller, 197 F.3d 644 (3d Cir. 1999), the Court issued an Order advising Petitioner that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") prohibits consideration of a second or successive habeas petition absent certification from the Third Circuit that certain very specific and rare circumstances exist. With that in mind, Petitioner was ordered

## II.  Discussion

Pro se pleadings are held to less stringent standards than formal pleadings drafted by lawyers.  Haines v. Kerner, 404 U.S. 519, 520 (1972); Hurd v. Romeo, 752 F.2d 68, 70 (3d Cir. 1985). However, even a pro se plaintiff must be able to prove a "set of facts in support of his claim which would entitle him to relief."  Haines, 404 U.S. at 520-21 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

Petitioner brings his pro se motion pursuant to 28 U.S.C. § 2255.[5]  An evidentiary hearing is not required on a Section 2255 motion if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

---

to advise the Court as to how he wished to proceed in this case, specifically, whether he wished to have his motion ruled upon as filed and lose the ability to file successive petitions absent Third Circuit certification, or whether he wished to withdraw the motion and file one all-inclusive Section 2255 petition within the one-year statutory period of the AEDPA. (Doc. No. 169).  Petitioner informed the Court that he wished to proceed on his motion as filed.

[5]   This statute permits a "prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . [to] move the court which imposed the sentence to vacate, set aside or correct the sentence."  28 U.S.C. § 2255(a).

Petitioner's motion is based on a claim of ineffective assistance of counsel.  Indeed, the proper and preferred vehicle for advancing claims of ineffective assistance of counsel is through a Section 2255 motion.  United States v. Nahodil, 36 F.3d 323, 326 (3d Cir. 1994).

In order to prevail on a claim of ineffective assistance, a defendant:

> must show both that: (1) counsel's representation fell below an objective standard of "reasonableness under prevailing professional norms;" and (2) [he] suffered prejudice as a result - that is, there is a reasonable probability that, but for the counsel's deficient performance, *the result of the proceeding would have been different*.

Sistrunk v. Vaughn, 96 F.3d 666, 670 (3d Cir. 1996) (citing Strickland v. Washington, 466 U.S. 668, 694 (1984)) (emphasis added).  Where the claim of ineffectiveness arises in the guilty plea context, the United States Supreme Court ("Supreme Court") has held that "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, *he would not have pleaded guilty and would have insisted on going to trial*."  Hill v. Lockhart, 474 U.S. 52, 59 (1985) (emphasis added).  If "the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the

5

'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." Id.

Although Strickland requires a successful demonstration of both ineffectiveness and prejudice, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."[6] Strickland, 466 U.S. at 697.

Petitioner's claim arises out of his counsel's failure to challenge the superseding indictment ("Pennsylvania indictment") on double jeopardy grounds prior to advising him to plead guilty.  Petitioner contends that a 2005 drug conspiracy conviction in the Southern District of Indiana barred prosecution for the drug conspiracy charged in the 2007 Pennsylvania indictment because the Pennsylvania conspiracy was part of the same over-arching drug conspiracy.  For the reasons that follow, the Court finds that Petitioner's claim of ineffective assistance lacks merit because he has failed to establish a colorable claim of double jeopardy.

A.   Indiana drug conspiracy

---

[6]   Indeed, the Third Circuit has endorsed "the practical suggestion in Strickland to consider the prejudice prong before examining the performance of counsel prong 'because this course of action is less burdensome to defense counsel.'"  United States v. Booth, 432 F.3d 542, 546 (3d Cir. 2005) (quoting United States v. McCoy, 410 F.3d 124, 132 n.6 (3d Cir. 2005).

Petitioner's conviction was the product of a superseding
indictment that was filed in the Southern District of Indiana
("Indiana indictment") on July 28, 2004.[7]  It charged Petitioner
and Eddie L. Thomas, Jr. ("Thomas") with conspiring to possess
with intent to distribute and distributing five kilograms or
more of a mixture or substance containing a detectable amount of
cocaine, in violation of 21 U.S.C. § 846.  The indictment
alleged that Petitioner and Thomas conspired to distribute
cocaine throughout the Southern District of Indiana from January
to March of 2004.  During this time frame, Petitioner lived in
San Francisco while Thomas lived in Indiana.  They had agreed
that Petitioner would ship cocaine in packaged Frito Lay bags
from San Francisco to Thomas and that Thomas would send the drug
proceeds back to Petitioner in packaged cereal boxes.

The investigation that led to the Indiana indictment was
conducted by an Indiana drug task force that gathered
information through confidential informants, controlled
purchases, and a consensually recorded phone call placed in
Indiana.  The informants bought cocaine from Thomas either
directly or through people he had supplied.  After three
controlled purchases and the seizure of a package containing

---

[7]   A second superseding indictment with additional forfeiture
allegations was filed on October 19, 2004.

drug money, Thomas was arrested.  He told the police that

Petitioner was his supplier and they had first been introduced

in Indianapolis.  Petitioner's arrest came a few months after he

was recorded discussing a specific drug transaction on a

telephone call placed by Thomas.  He pled guilty to the

conspiracy on June 10, 2005, and on September 16, 2005, he was

sentenced to 70 months' imprisonment.  He began serving his

sentence at FCI La Tuna in Texas that fall.

B.    Pennsylvania drug conspiracy

Petitioner was indicted for the Pennsylvania conspiracy in

June of 2007, while he was serving his sentence for the Indiana

conspiracy.  The investigation leading to the indictment

revealed that prior to Petitioner's arrest for the Indiana drug

conspiracy, he was involved in a conspiracy to distribute

cocaine throughout the Western District of Pennsylvania.  During

that time, Petitioner and Shannon, his supplier, lived in San

Francisco and Kimbrew, his distributor, lived in Pittsburgh.

Information received through confidential informants revealed

that Petitioner directly supplied Kimbrew with cocaine for

distribution in Pittsburgh through numerous shipments using

Federal Express.  After Petitioner was arrested in August of

2004, the Pittsburgh operation took a hiatus because Kimbrew was

left without a supplier.  In January of 2006, however,

Petitioner was contacted by Shannon who expressed interest in resuming distribution in Pittsburgh. Recorded telephone calls from prison between January and December of 2006 documented Petitioner's attempt to "reactivate" the Pennsylvania conspiracy by facilitating the creation of a new distribution agreement between Shannon, Kimbrew, and himself. With the help of his wife Casee, Petitioner notified Kimbrew that Shannon wanted to take Petitioner's place as Kimbrew's direct supplier and Kimbrew agreed. The new arrangement consisted of Shannon shipping cocaine directly to Kimbrew in Pittsburgh and Kimbrew sending the proceeds in packages back to Shannon. Records indicated that Kimbrew flew to San Francisco in March of 2006 to meet with Shannon and that Shannon met with Kimbrew in Pittsburgh later that December. The group was indicted on the drug conspiracy charge approximately one year after a package containing drug money was seized.[8]

### C. Analysis

Petitioner thus contends that he twice was put in jeopardy for the same conduct because both the Pennsylvania and Indiana

---

[8] The package was sent by Kimbrew and was addressed to "J. Jordan" in San Francisco. It was intercepted on June 15, 2006, by employees at a mail facility in Pennsylvania and $255,770 was discovered in the package following the execution of a search warrant.

indictments alleged the same general criminal behavior and charged him with violating the same statute.[9]   He insists that there was only one illegal agreement, which was to distribute cocaine in various places for profit.   He does not contest his factual guilt, but instead, argues that prosecution for the Pennsylvania drug conspiracy was barred by his Indiana conviction because the two conspiracies were the same "in law and in fact."

The Government contends that the Pennsylvania indictment alleged a separate and distinct drug conspiracy and that Petitioner is unable to show that he twice was prosecuted for an offense that was the same "in fact."   The Court agrees.

------

[9]    In support of his contention that only one conspiracy existed, Petitioner cites to the fact that seven kilos of cocaine from the Indiana conspiracy constituted relevant conduct in the sentencing calculation for the Pennsylvania conspiracy. This argument must fail in light of Witte v. United States, 515 U.S. 389, 397 (1995), where the Supreme Court held that "consideration of uncharged conduct in arriving at a sentence within the statutorily authorized punishment range" did not constitute punishment for that conduct for purposes of double jeopardy.   See also id. at 403-04 (finding that a guideline sentence that includes past relevant criminal conduct "constitutes punishment only for the offense of conviction for purposes of the double jeopardy inquiry").   Furthermore, the same argument was rejected in United States v. Castellar, 2011 WL 6425493, at *3 (3d Cir. 2011), where the Third Circuit cited Witte to hold that the inclusion of past relevant criminal conduct at sentencing did not run afoul of the Double Jeopardy Clause.

The Double Jeopardy Clause guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Double jeopardy is an affirmative defense that attaches when it is "shown that the two offenses charged are in law and in fact the same offense." United States v. Felton, 753 F.2d 276, 278 (3d Cir. 1985). It "prohibits repeat trials for the same offense, not for the same conduct." United States v. Rigas, 605 F.3d 194, 204 (3d Cir. 2010) (rehearing en banc). Its central purpose is to preclude "the government from 'splitting one conspiracy into several prosecutions.'" Id. at 212 (quoting United States v. Becker, 892 F.2d 265, 268 (3d Cir. 1989)). It "serves the function of preventing both successive punishment and successive prosecution." United States v. Dixon, 509 U.S. 688, 704 (1993).

In the context of successive conspiracy prosecutions, the Third Circuit applies a "totality of the circumstances test to evaluate the merits" of a double jeopardy claim. United States v. Liotard, 817 F.2d 1074, 1078 (3d Cir. 1987). Under the framework set forth in Liotard:

> [A] conspiracy defendant will make out a non-frivolous showing of double jeopardy if he can show that (a) the "locus criminis" of the two alleged conspiracies is the same . . . (b) there is a significant degree of temporal overlap between the two conspiracies charged . . . (c) there is an

> overlap of personnel between the two
> conspiracies (including unindicted as well
> as indicted coconspirators) . . . and
> (d) the overt acts charged and the role
> played by the defendant according to the two
> indictments are similar.

Id. at 1078.  "The ultimate goal of the totality-of-the-

circumstances test is to determine 'whether there are two

agreements or only one.'"  Rigas, 605 F.3d at 213 (quoting

United States v. Smith, 82 F.3d 1261, 1267 (3d Cir. 1996).

After considering the totality of the circumstances, the Court

concludes that two separate and factually distinct agreements to

distribute cocaine existed.

First, the "locus criminis" of the two conspiracies is

different.  "Locus criminis" is defined as "the locality of a

crime; the place where a crime was committed."  Smith, 82 F.3d

at 1268.  Here, the locus criminis alleged in the 2004

indictment is the "Southern District of Indiana and elsewhere,"

whereas the locus criminis alleged in the 2007 indictment is the

"Western District of Pennsylvania and elsewhere."  The point of

distribution that resulted in Petitioner's first conviction was

Indiana, whereas the point of distribution that resulted in his

second conviction was Pennsylvania.  To be sure, the facts

underlying the Indiana indictment clearly demonstrate that it

was predicated upon Petitioner's conduct in conspiring with

Thomas to distribute cocaine in Indiana because the evidence
gathered in the course of that investigation would have been
insufficient to warrant a drug conspiracy conviction in
Pennsylvania.[10]

The facts surrounding the Pennsylvania indictment likewise
show that it was predicated on Petitioner's conduct in
conspiring with Shannon and Kimbrew to distribute cocaine in
Pennsylvania.  Indeed, the Government's summary of evidence
recited at Petitioner's change of plea hearing contained only
two sentences that referenced the Indiana drug conspiracy.[11]  The

---

[10]   The Court is mindful that the "totality of the
circumstances" approach is the applicable framework as opposed
to the "same evidence test."  The Court, however, still views
this factor as relevant to the determination of whether one or
two agreements existed.  The Court notes that the primary reason
for adopting the totality of the circumstances test in the
context of successive conspiracy prosecutions arose from the
concern that the same evidence test would result in courts
placing "undue emphasis upon the evidence used to prove the
commission of the overt acts alleged."  Smith, 82 F.3d at 1267
(internal quotations and citations omitted).  As this case
involves a drug conspiracy, no overt acts are alleged in the
indictment and therefore the concern with analyzing whether "the
evidence required to support a conviction upon one of [the
indictments] would have been sufficient to warrant a conviction
upon the other" is not presented.  United States v. Young, 503
F.2d 1072, 1075 (3d Cir. 1974).

[11]   The two sentences are as follows: "And that in
approximately the summer of 2004 that this witness was advised
that Mr. Kimbrew's supplier had been arrested based on cocaine
that had been seized in Indianapolis, Indiana.  Records show in
approximately 2004, Mr. Ray Kelly was arrested on drug charges
in Indianapolis, Indiana and began serving a 70 month sentence

sole purpose of this reference, however, was to demonstrate that certain information received from a particular witness was corroborated by court records. Thus, the evidence supporting the Pennsylvania conspiracy would have been insufficient to warrant a drug conspiracy conviction in Indiana.

In addition to the lack of mutually supporting evidence, Petitioner cannot show that any important acts done in furtherance of the Pennsylvania conspiracy took place in Indiana and vice versa. See Smith, 82 F.3d at 1268. Any important acts done in furtherance of the Indiana conspiracy took place in San Francisco and the Indianapolis area, and any important acts done in furtherance of the Pennsylvania conspiracy took place in San Francisco, Los Angeles, Texas, and the Pittsburgh area. The record strongly supports the conclusion that two separate and factually distinct crimes were committed in two different states. Accordingly, the Court finds that the locus criminis of the Indiana conspiracy was Indiana and the locus of the Pennsylvania conspiracy was Pennsylvania.[12]

---

at FCI La Tuna in the fall of 2005." Change of Plea Transcript (Doc. No. 173-1 at 15).

[12] Petitioner mistakenly asserts that the locus criminis for the Indiana conspiracy was San Francisco where he, his wife, and Shannon were located, and that Indiana and Pittsburgh merely were the "spokes" of the San Francisco "hub". Petitioner, however, has failed to establish the existence of a "hub and spoke

Second, the degree of temporal overlap between the two conspiracies is minimal.  While there is some overlap, "such temporal overlap by itself [does] not prove one conspiracy." Smith, 82 F.3d at 1267 (citing Becker, 892 F.2d at 268 (overlapping time periods "does not indicate that only one conspiracy existed.")).  Indeed, the Third Circuit has recognized that "a party can be involved in more than one conspiracy at one time."  Becker, 892 F.2d at 268.  Here, the overlapping time period does not extend beyond two months, a level of overlap that the Third Circuit already has held does not rise to the level of presenting a double jeopardy claim. See id. (first indictment alleged a conspiracy from "Spring of 1981 until July 27, 1981 and second alleged conspiracy from "in or about 1981" to "November 13, 1987); see also United States v. Daniels, 857 F.2d 1392, 1393 (10th Cir. 1988) (finding separate offenses even when second conspiracy was completely subsumed in time by first conspiracy).

Third, while there may have been some overlap in personnel, such a factor is "not indicative of only one conspiracy." Becker, 892 F.2d at 268; see Cedeno v. United States, 2010 WL 2682173, at *5 (D.N.J. 2010) (overlap in personnel "does not automatically signal a single conspiracy").  Petitioner's

conspiracy" for the reasons set forth under the third "overlap-in-personnel" prong.

assertion that this was the quintessential "hub and spoke conspiracy" is misguided. He claims that he, his wife, and Shannon served as the San Francisco "hub", while Thomas and Kimbrew served as the Indiana and Pennsylvania "spoke participants." Petitioner argues that he and Shannon were connected to each of the spokes by virtue of the drug supplier-drug dealer relationship. A similar argument was raised and rejected in United States v. Kemp, 500 F.3d 257 (3d Cir. 2007), where the government had charged a single conspiracy but the evidence failed to demonstrate sufficient interdependence between the coconspirators. The government argued that a single conspiracy had been proved because the two core conspirators dealt with every one of the spoke participants both individually and together. Id. at 291. The Third Circuit disagreed, stating that "[t]his could be said for any hub-and-spokes style conspiracy" and that "Kotteakos and its progeny make clear that *there must be overlap among the spokes, not just between the hub and the various spokes*." Id. (emphasis added).

In Kotteakos v. United States, 328 U.S. 750 (1946), several different individuals fraudulently obtained loans through Brown, the central figure. Although the spokes were all connected to Brown, there was no evidence of any connection between the spokes themselves. Id. at 754. The Supreme Court found that a

16

"hub and spoke" conspiracy had not been established and characterized the conspiracy as a "rimless wheel because there [wa]s no rim to connect the spokes into a single scheme." Id. at 755. Kotteakos, therefore, directs the finding of multiple conspiracies "where the spokes of a conspiracy have no knowledge of or connection with any other [spoke], [and are] dealing independently with the hub conspirator . . . ." United States v. Chandler, 388 F.3d 796, 807 (11th Cir. 2004) (citing Kotteakos, 328 U.S. at 754-55 (no connection between spokes means "there is not a single conspiracy, but rather as many conspiracies as there are spokes.")).

In order to establish interdependence between the spokes, it must be shown that their "combined efforts" were "required to insure the success of the venture." Chandler, 388 F.3d at 811. If the spokes did not depend on each other, aid each other, or share any interest in the others' success, merely having the "same goal" is insufficient to establish interdependence. Id. It must be shown that "the activities of the spoke participants were, to some degree, interdependent or mutually supportive." Smith, 82 F.3d at 1271. The inquiry, therefore, must focus on the "character of the agreements" between the spoke participants, and not on the relationship between the hub and spoke members. Id. at 1272.

17

In light of the above, Petitioner clearly has failed to establish the existence of a "hub and spoke" conspiracy. The record is devoid of evidence that suggests that Thomas and Kimbrew were committed to the same illegal agreement. Petitioner has not demonstrated that they were "engaged in any common activities or that their respective schemes were interdependent." Smith, 82 F.3d at 1271. While they may have been aware of each others' activities and objectives, there is nothing to indicate that they "had [any shared] interest in the [other person's] accomplishment of those objectives." Id. It is clear that Thomas and Kimbrew were disconnected distributors who "deal[t] independently with the hub conspirators." Chandler, 388 F.3d at 811. This is highlighted by the fact that there was a split in pricing for the cocaine; Petitioner charged Thomas $20,000 per kilogram and only charged Kimbrew $17,000 per kilogram. Petitioner's Memorandum (Doc. No. 168 at 14).

While Petitioner maintains that Thomas and Kimbrew had the same goal, which was to earn a profit through the distribution of cocaine, the evidence fails to establish that this was a common goal that required their combined efforts to accomplish. See Chandler, 388 F.3d at 811 ("[A]lthough each of these alleged spoke conspiracies had the same goal, there was no evidence that this was a common goal")(emphasis added). To the contrary,

there can be no common goal to distribute cocaine where one of the spoke participants did not want Petitioner to distribute to the other spoke participant. By Petitioner's own admission, Kimbrew cautioned him against setting up an Indiana operation and attempted to dissuade him from doing so because he felt it would jeopardize the Pittsburgh operation. Petitioner's Memorandum (Doc. No. 168 at 14) ("Kimbrew was concerned about the distribution in Indiana and elsewhere. He felt it was too risky.").

Kimbrew's concern about the Indiana conspiracy further evinces the lack of interdependence and overlap between Kimbrew and Thomas, as they did not depend on each other, aid each other, or have any interest in the success of the other. See Chandler, 388 F.3d at 811. Nor did they "derive[] [any] benefit, financial or otherwise," from the others' success in their respective schemes. Smith, 82 F.3d at 1271. Petitioner, therefore, has "failed to provide a basis for inferring that all of the conspirators were tied together into one conspiracy." Smith, 82 F.3d at 1268. He likewise has not established any interdependence between the two distribution schemes because "one could fail, while the other continued." Cedeno v. United States, 2010 WL 2682173, at *6 (D.N.J. 2010); Smith, 82 F.3d at 1271 ("[N]or was the success of the conspiracy in one state

19

contingent on the success of the conspiracy in the other.").
This conveniently is illustrated by the present facts, as the
Indiana conspiracy failed in 2004 upon Petitioner's arrest while
the Pittsburgh conspiracy remained intact until 2007.

Finally, the "role" played by Petitioner in each conspiracy
was different.  During the Indiana conspiracy, Petitioner lived
in San Francisco and acted as the main supplier to Thomas in
Indiana and Kimbrew in Pennsylvania.  The role he played in the
Pennsylvania conspiracy changed once he was arrested for the
Indiana conspiracy, and his role transformed to that of a
"middleman" who brokered cocaine transactions between Shannon
and Kimbrew from prison in Texas.  Regardless, even if he played
identical roles in each conspiracy, an individual "may play a
similar role in multiple, unrelated conspiracies."  Smith, 82
F.3d at 1269; see also United States v. Robinson, 774 F.2d 261,
273-75 (8th Cir. 1985).

Petitioner is mistaken in his assertion that just because
both indictments involved "the exact same charge" in violation
of the same statute, he was being charged with participating in
the same illegal agreement.  Petitioner's Memorandum (Doc. No.
168 at 8).  He fails to realize that the "mere fact that the
crimes were of the same type does not instantly afford [him] a
double jeopardy argument."  Cedeno, 2010 WL 2682173, at *5.

Indeed, "[t]he guarantee against double jeopardy does not insulate a criminal from punishment for subsequent offenses merely because he chooses to continue committing the same type of crime." Smith, 82 F.3d at 1273.

Against this backdrop, the totality of the circumstances leads us to conclude that Petitioner was involved in two separate and factually distinct conspiracies to distribute cocaine to different distributors in different states.[13]   The

---

[13]    Even assuming for the sake of argument that only one drug conspiracy existed, the principles of double jeopardy still would not bar prosecution for the Pennsylvania indictment because Petitioner "re-entered" the Pennsylvania conspiracy after it came to a halt as a result of his 2004 arrest.   In Petitioner's own words, he wanted to "reactivate" the Pittsburgh drug conspiracy and he accomplished his goal through various recorded telephone calls from prison and the help of his wife. See Petitioner's Memorandum (Doc No. 168 at 11).   Case law in this area makes clear that "one who insists that the music stop and the piper be paid at a particular point must at least have stopped dancing himself before he may seek such an accounting." Garrett v. United States, 471 U.S. 773, 789 (1985); see also United States v. Asher, 96 F.3d 270, 274 (7th Cir. 1996) ("[The defendant]'s reentry into the conspiracy was a distinct act that could, consistently with the Double Jeopardy Clause, expose him to a new prosecution despite his prior conviction for participating in the same conspiracy."); United States v. Dunn, 775 F.2d 604, 607 (5th Cir. 1985) ("[F]urther [participation in an] 'old' conspiracy after being charged with that crime becomes a new offense for purposes of a double jeopardy claim."); United States v. Lopez, 153 F.3d 723, 1998 WL 476788, at *2 (4th Cir. 1998) (the defendant's involvement in a conspiracy ended with his arrest and conviction and he is "subject to another conspiracy prosecution for any further involvement in the conspiracy."); United States v. Sharpe, 193 F.3d 852, 864 (5th Cir. 1999), cert. denied, 528 U.S. 1173 (2000) (person's

fact that Petitioner was charged with violating the same statute

in two different states is irrelevant because the charges stem

from two unrelated agreements to distribute cocaine and thus are

not the same "in fact." Even if Petitioner's counsel had

challenged the indictment on double jeopardy prior to advising

him to plead guilty, it would not have changed the outcome of

the proceedings because the Court would have found such a claim

to be meritless for the reasons set forth above. See Hill, 474

U.S. at 59. As a result, Petitioner is unable to satisfy the

"prejudice" prong required under Strickland. Accordingly,

Petitioner's counsel was not constitutionally ineffective, as

the failure to raise meritless legal arguments does not

constitute a Sixth Amendment deprivation of the right to

effective counsel.[14] United States v. Sanders, 165 F.3d 248, 253

(3d Cir. 1999).

---

participation in a conspiracy ends upon arrest and further
participation in old conspiracy becomes a new offense).

[14]     Petitioner's contention that his guilty plea was rendered
involuntary by his counsel's ineffective assistance is moot
because counsel's performance was not constitutionally
ineffective. See Boyd v. Waymart, 579 F.3d 330, 349 (3d Cir.
2009)(collecting cases)(voluntariness of guilty plea hinges on
whether the defendant received ineffective assistance from his
counsel at the plea stage and whether the deficient performance
itself rendered the plea involuntary).

## III. Conclusion

For all of the above-stated reasons, Petitioner's motion is denied in its entirety.[15]  Further, this Court will not issue a certificate of appealability in this case.  A certificate of appealability may issue under 28 U.S.C. § 2255 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. 2253(c)(2).  For the reasons set forth above, Petitioner has not made a substantial showing of the denial of a constitutional right and a certificate of appealability should not issue in this action.


                                        s/Alan N. Bloch
                                        United States District Judge

Dated:          February 9, 2012

ecf:            Counsel of record

cc:             Ray Kelly, #94266-011
                FCI Lompac
                3600 Guard Road
                Lompac, CA  93436

---

[15]     An evidentiary hearing is not necessary because the record conclusively shows that Petitioner is not entitled to relief under Section 2255.  See Brown v. United States, 556 F.2d 224, 227 (3d Cir. 1977).